ams

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| GRIFF G. ARGO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | Case No. 03-4119-JAR |
| BLUE CROSS BLUE SHIELD ) | |
| OF KANSAS, INC., ) | |
| ) | |
| Defendant. ) | |
| _____) | |

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant  Blue Cross Blue Shield of Kansas, Inc. (BCBS) moves for summary judgment (Doc. 34) in this Title VII action, on plaintiff's claims of reverse gender discrimination and retaliation, arising out of his termination from BCBS.  The Court grants BCBS summary judgment on the reverse gender discrimination claim because plaintiff has neither demonstrated a prima facie case of disparate treatment or discrimination based on his sex, nor shown that BCBS's statement that he was terminated for problems in performance, attitude and conduct, was false or a pretext for discrimination.  The Court further grants BCBS summary judgment on plaintiff's claim of retaliation because plaintiff has neither demonstrated a causal connection between his filing an internal complaint and his termination, nor demonstrated that BCBS's stated reason for the termination was false or pretextual.

## I.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[1]  A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[2]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[3]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[4]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[5] "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[6] The burden may be met by showing that there is no evidence to support the nonmoving party's case.[7] If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could

---

[1]  Fed. R. Civ. P. 56(c).

[2]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

[3]  *Id.*

[4]  *Id.* at 251-52, 106 S. Ct. at 2512.

[5]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

[6]  *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325, 106 S. Ct. at 2548)).

[7]  *Id.*

2

find for the nonmovant."[8]  When examining the underlying facts of the case, the Court is cognizant that

all inferences must be viewed in the light most favorable to the nonmoving party and that it may not

make credibility determinations or weigh the evidence.[9]

## II.  Factual Background

### A.  Plaintiff's Affidavit

Under the local rules of this district, "[a]ffidavits or declarations [must] be based on personal

knowledge and [made] by a person competent to testify to the facts stated which shall be admissible in

evidence."[10]  Furthermore, a witness's testimony is only admissible if evidence supports a finding that

the witness has personal knowledge of a matter.[11]  "Conclusory and self-serving affidavits are not

sufficient."[12]  Plaintiff relies on his own affidavit to support various factual statements in his response

brief.  BCBS argues that reliance on this affidavit is impermissible and that paragraph 21 of plaintiff's

affidavit should be stricken, "to the extent plaintiff is attempting to create a 'sham' issue of fact by

relying on his own self-serving affidavit," because the statement contradicts earlier sworn deposition

testimony.

Initially, the Court notes that contradictions in a witness's statements do not, alone, preclude the

---

[8]  *Id.*

[9]  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

[10]  D. Kan. R. 56.1(d).

[11]  Fed. R. Evid. 602.

[12]  *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (*citing Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991)); *see Johnson v. Potter*, No. 01-4182-SAC, 2004 WL 2823237, at *2 (D. Kan. Nov. 10, 2004).

Court from considering such testimony.[13]  However, "situations [exist] where a district court may be justified in disregarding certain contradictory testimony . . . when they conclude that it constitutes an attempt to create a *sham fact issue*."[14]  In determining whether plaintiff's contradictory affidavit seeks to create a sham issue of fact, the Court must consider: (1) whether plaintiff was cross-examined during his deposition; (2) whether plaintiff had access to the pertinent evidence at the time of his deposition or whether the affidavit is based on newly discovered evidence; and (3) whether plaintiff's deposition testimony reflects confusion which the affidavit attempts to explain.[15]

The Court finds that plaintiff's affidavit directly contradicts his deposition testimony that he did not recall whether any specific person had been terminated for poor performance at BCBS. Plaintiff was employed as an Individual Enrollment Specialist at BCBS.  In the deposition, BCBS counsel asked plaintiff to name all female Individual Enrollment Specialists who did not make their annual goals during his tenure at BCBS.  Plaintiff identified the names of seven women, and noted that three of them no longer worked at BCBS.  Plaintiff further testified that he believed that they resigned, but that he did not know the details of why they left.  When asked if he knew of any employee who left or was fired due to poor performance, his response was equivocal: "There – it – it is possible, yeah.  If they were well – well below the standards."

In contrast, his affidavit unequivocally states: "No female Individual Enrollment Specialist was

---

[13]  *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001) (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

[14]  *Id.* (quotation omitted).

[15]  *Id.*; *Dempsey v. City of Baldwin City, Kan.*, 333 F. Supp. 2d 1055, 1059 (D. Kan. 2004).

4

terminated during my employment for failing to make monthly or yearly goals." Plaintiff cites no new evidence in support of this statement, nor does he refer back to his deposition testimony in an attempt to clarify his earlier statements. Aside from the prefatory language of his statement in paragraph 1 of this self-serving affidavit, plaintiff does not indicate that he has personal knowledge of the conditions under which female employees were terminated or resigned during his tenure at BCBS.

In order to enforce the standard set forth in Fed. R. Civ. P. 56(e) and D. Kan. R. 56.1(d), that affidavits be based on personal knowledge, the Court will simply disregard any portion of plaintiff's affidavit that does not prove to be based on personal knowledge.[16] Any assertions made by plaintiff in his affidavit that are not supported by the record, by a demonstration of personal knowledge or by corroborating evidence, are insufficient to establish a genuine issue of material fact.[17]

### B. Uncontroverted Facts

The following facts are derived from the summary judgment record and are either uncontroverted, stipulated to, or viewed in the light most favorable to plaintiff. BCBS hired plaintiff in 1995 as an Individual Enrollment Specialist. As of October 2001, the job description for Individual Enrollment Specialist was in part, a "position directly accountable for promoting individual products

---

[16] *See Kephart v. Data Systems Int'l., Inc.*, 243 F. Supp. 2d 1205, 1209 (D. Kan. 2003). The only paragraphs in plaintiff's affidavit that do not appear to be wholly supported by personal knowledge or evidence elsewhere in the record are paragraphs 1, 2, and 21. The Court will simply limit the assertions made in paragraphs 1 and 2 to the extent of plaintiff's knowledge.

[17] *Salguero v. City of Clovis*, 366 F.3d 1168, 1177 n.4 (10th Cir. 2004). Aside from the assertions made in plaintiff's affidavit, plaintiff's response cites to documents that do not appear to exist in the record. Specifically, plaintiff's contentions in his statement of "Additional Material Controverted Facts," paragraphs 13-14, refer the Court to "Comments to Plaintiff's Deposition Exhibit #34 and #35." The Court has reviewed the record submitted with the briefs and is unable to locate any document that fits either of these descriptions. The Court will not rely upon factual assertions that have no support in the record.

associated with direct mail and media activities.  This position is on assigned goals/incentive driven."

Essential job functions included, "[r]esponsible for meeting assigned

 annual sales goals for health, dental and life products to meet Plan objectives."

### 1. Performance

From 1996 to 2001, plaintiff underwent annual performance evaluations, which included

assessment of categories of performance, such as production, administration, personal growth; and also

included an overall summary of the employee's performance.  In 1996, plaintiff received an overall

performance level rating of 89-80%, which was characterized as "Expected."[18]  In 1997 and 1998,

plaintiff received overall ratings of 94-90% and 90%, respectively; both were characterized as a

"Commendable" rating.  In 1999 Brenda Oliva became plaintiff's immediate supervisor; and for 1999,

2000 and 2001, Oliva gave plaintiff  the highest overall rating available, "Distinguished."  These annual

evaluations were documented on forms that were not identical, but were similar, from year to year.  In

most of these years, the evaluation form assigned a weight to the various categories of performance; but

the weight assigned to the various categories was not consistent over these years.[19]

In 2002, BCBS established monthly and annual sales goals for plaintiff for dental contracts, life

insurance premiums and health contracts.  In 2002, plaintiff had a monthly sales goal of 23 dental

contracts, which he exceeded every month; thus he exceeded his annual goal of 275 dental contracts,

---

[18] In 1996, plaintiff and another BCBS employee were terminated for their involvement in a "multi-level
marketing business" that allegedly conflicted with their employment at BCBS.  After pursuing the internal grievance
process, plaintiff was reinstated within one week after termination.

[19]  For example, in 1997, Argo's production on all contracts was weighted at 40% of his evaluation, while in
1998 it was weighted at 60%.

selling 436 dental contracts in 2002.  Plaintiff had a monthly sales goal of $917 in life insurance

premiums, which he did not meet for three months, but exceeded for nine months; thus plaintiff

exceeded his annual goal of $11,000, by producing $18,754.80 in life insurance premiums for 2002.  In

eight months in 2002, plaintiff failed to meet his monthly goal of 60 health contracts; and he failed to

meet his annual goal of 725 health contracts, selling only 719 health contracts in 2002.[20]

   In April 2002, Oliva began noting on her monthly status reports when plaintiff had failed to meet

his monthly goal and when plaintiff had exceeded his year-to-date goals, despite falling short on any

monthly goal.  In the September 2002 status report, Oliva noted: "Griff, you're still on target for making

your goal this year but you've had 5 months that you did not make your monthly goal.  Can you please

share with me what you plan on doing to assure me you will make your 2002 health goal?"  In the

December 2002 monthly status report, Oliva noted: "You did not make your yearly goal for 2002.  We

need to look at 2003 and see what you can do differently so we don't have a repeat of this year.  Let

me know what ideas you have."

   In November 2002, Oliva had advised plaintiff that his annual evaluation, which was typically

done in November, was postponed for thirty days.  In December, Oliva advised plaintiff that his

evaluation was postponed for another thirty days.  Plaintiff never received a performance evaluation for

2002.

   On January 17, 2003, Oliva sent an email to another supervisor advising that earlier that day,

the Director of Individual Sales, Shelley Pittman, advised that she wanted them to "do the following for

---

[20]The goal attainment forms submitted to the Court do not isolate the monthly totals indicated in the table.
Instead, they indicate the year-to-date goals for each month and plaintiff's year-to-date totals.  The Court determined
the monthly totals by subtracting each year-to-date total from the year-to-date total for the previous month.

your employees performance:"

> **%**      Representative doesn't meet their monthly goal 3 months in
> a row – Write up on monthly evaluation or speak to rep
> **%**      Representative doesn't meet their monthly goal 4 months in
> a row – Formal write-up carbon copy  Tonya Fuller and Shelley
> **%**      Representative doesn't meet their monthly goal 5 months in
> a row – Terminate employee
> We need to advise each Representative individually that this will
> happen.  If you have any questions please let me know.

Plaintiff admits learning of this policy sometime in January 2003.  Before that plaintiff was not aware of

any "formal written or verbal policy" requiring Individual Enrollment Specialists to reach their monthly

and/or yearly goals.

On January 24, 2003, plaintiff and Oliva signed a Goal Attainment Status form for sales through

January 2003.  This status report showed that plaintiff had sold 35 health contracts, 20 dental contracts

and $400.80 in life insurance premiums, well under the monthly goals set in 2002.  Oliva noted on the

form: "Griff, this is the 8th month in a row that you have not met the monthly goal.  If you do not met

(sic) your February and March monthly goal you will be terminated from Blue Cross Blue Shield of

Kansas 3-7-03."

### 2. Attitude and Attendance

Beginning in 2001, Oliva began documenting what she characterized as plaintiff's attendance

and attitude issues. On June 6, 2001,  Oliva notified plaintiff by email, that he had been tardy that

morning and instructed him to begin emailing her every morning when he arrived to work so that she

could monitor his attendance.  In this June 6, 2001 email, Oliva warned plaintiff, "If you are in after

8:00 again I will formally put you on written probation."  The next documentation of an attendance

problem was in a memorandum from Oliva to plaintiff, in which Oliva described how plaintiff had been

routinely sending her his morning arrival email between 8:02 and 8:05. She warned him that he must be ready to work at exactly 8:00, and that if he continued to arrive to work late, it would be a "performance issue." According to the Blue Cross Blue Shield Employee Handbook, revised in July 2001:

> Employees are expected to be at their desk and ready to begin work at their scheduled start time. Arrival at work within the first 7 1/2 minutes after the scheduled start time is recorded on the time sheet as a full 15 minutes worked. . . . However, any arrival after the scheduled start time is tardy, including arriving within the first 30 minutes after the scheduled start time. Any late work arrivals that are not pre-arranged at least one work day in advance are considered tardy.
> . . .
> Excessive tardiness or absenteeism will result in corrective action which may include loss of participation in flextime or termination.

In November 19, 2002, Oliva again documented issues with plaintiff after meeting with him to discuss her concerns. They had a disagreement over whether plaintiff was reading a book for fifteen minutes when he should have been making phone calls. Oliva expressed concern over plaintiff's time management skills and his attitude with her. Oliva stated that, after checking plaintiff's phone records, she discovered that he had not made a phone call in 53 minutes. At this time, Oliva relieved plaintiff of the obligation to email her every morning upon his arrival, as she was able to monitor his arrival through phone logs.

On November 21, 2002, plaintiff emailed Oliva and told her that he had no calls that were "very old/upset" and proceeded to describe problems he was having with a co-worker who was helping him with his workload. In response, Oliva advised plaintiff that there were in fact two older calls that he should have made and that he should send her copies of problems he was having with his co-worker, although the problems were ultimately his responsibility. She also stated that if he disagreed

with her assessment, he should discuss it with her in her office.

In a memorandum dated November 22, 2002, Oliva formally notified plaintiff and Shelley Pittman of plaintiff's "poor performance specific to . . . attitude and not using . . . time correctly." Oliva's memorandum documented the problems she and plaintiff discussed two days before, as well as the fact that plaintiff had not met his sales goal for the year to date.  The memorandum described Oliva's perception that plaintiff had been resisting her directives.  The memorandum also noted that Oliva had reviewed call reports for the previous three days and discovered that plaintiff was not on the phone for fourteen hours during that time period.  Oliva  warned: "If your attitude does not improve in 30 days and if directives continue to be ignored then I have no alternative but to terminate you from Blue Cross Blue Shield of Kansas."  Plaintiff did not sign Oliva's memorandum.

On December 9, 2002, Oliva documented that on December 4, 2002, plaintiff had advised customers to backdate enrollment forms, which is not allowed.  Oliva further documented that she had discussed this issue with Shelly Pittman, who directed Oliva to warn plaintiff that if he did not cease this practice, he would be terminated.  According to Oliva's notes on this occurrence, plaintiff denied the allegation, but agreed to stop this practice and Oliva had no further incidents with the issue.

Oliva issued a final warning to plaintiff on January 3, 2003, documenting past performance, attendance, and attitude warnings.  In this January 3 memorandum, Oliva warned:  "If you continue to not follow company or departmental policies which include but are not limited to tardiness, time utilization, not following directives, not calling in prior to 8:30 AM, etc., we will have no alternative but to terminate your employment at Blue Cross Blue Shield of Kansas."  This memorandum was signed by both plaintiff and Oliva.

10

### 3. *Complaint*

Three days later, on January 6, 2003, plaintiff filed a complaint with Pittman alleging a "persistent and increasing hostile work environment that I have endured for several months as a result of the conduct of the manager of individual sales, Brenda Oliva."  Plaintiff's complaint alleged a number of incidents of sexual harassment and gender discrimination by Oliva, primarily in 2002.  Plaintiff alleged that Oliva's conduct was inappropriate and that she intimidated him, given that she was his superior at BCBS.  One such incident was a birthday card that Oliva gave to plaintiff that pictured a woman in leather lingerie and read: "A Birthday Riddle.  Why do men like women in leather?  Because they smell like a new car.  Happy Birthday, Guy."  Plaintiff also alleged that he was "unjustly written up" by Oliva on January 3, 2003 and November 22, 2002.

BCBS's Equal Employment Officer investigated plaintiff's complaint; but found all of his allegations unsubstantiated, with the exception of the birthday card.  The EEO officer spoke to Oliva during the course of the investigation and recommended that Pittman counsel Oliva on some of her behavior, specifically the incident involving the birthday card.  The EEO officer relayed these findings to plaintiff on January 23, 2003–one day after Oliva had completed plaintiff's January 2003 monthly goal attainment status form that included the warning of termination on March 7 if he did not meet his sales goals in February and March.

On January 30, 2003, BCBS terminated plaintiff, without telling plaintiff why he was being terminated.  But a memorandum from Oliva to Pittmann and the EEO officer explained that on January 29, 2003, plaintiff signed into his phone thirteen minutes late and failed to complete certain assignments on January 29, 2003.

11

### *4. After Acquired Evidence*

On January 30, after telling him he was terminated, Oliva provided plaintiff with a box for his personal items.  Plaintiff unintentionally removed BCBS documents that contained Medicaid beneficiaries' names and identification numbers; the documents were discovered by BCBS employees who inspected the box before plaintiff left the building.  Soon after his termination, plaintiff filed a complaint with the Kansas Human Rights Commission and the Equal Employment Opportunity Commission.  He was issued a Notice of the Right to Sue on March 11, 2003.

## III. Discussion

BCBS moves for summary judgment on both of plaintiff's claims, gender discrimination and retaliation.[21]  BCBS also moves for summary judgment on its affirmative defense of after-acquired evidence, to effectively exclude front pay and reinstatement from any recovery awarded to plaintiff.  The Court will discuss each of these claims in turn.

### *A.  Reverse Gender Discrimination*

Plaintiff maintains that he was subjected to disparate treatment by BCBS when he was terminated from his employment.  Title VII prohibits an employer from discharging "any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."[22]  This prohibition of discrimination

---

[21]  Plaintiff  asserted a claim for sexual harassment due to a hostile work environment in the Final Pretrial Order; but in his response brief to the motion for summary judgment, plaintiff withdrew this claim.

[22]  42 U.S.C. § 2000e-2(a)(1).

based on sex protects men as well as women.[23]   Absent any direct evidence of discrimination because

of an employee's sex, the Court will employ the burden-shifting framework set out by the Supreme

Court in *McDonnell Douglas Corp. v. Green*[24] and *Texas Department of Community Affairs v.*

*Burdine*.[25]   Under this framework, plaintiff must first prove a prima facie case of discrimination.[26]   If

plaintiff is able to sustain this burden, the burden of production shifts to BCBS to "articulate a legitimate,

nondiscriminatory reason for rejection."[27]   If BCBS sustains this burden, the burden of production shifts

back to plaintiff to show that BCBS's proffered reason for rejection is false, or merely a pretext, and

the presumption of discrimination created by establishing a prima facie case "drops out of the picture."[28]

Although the burden of production shifts back and forth between the parties, the ultimate burden of

persuasion remains at all times with plaintiff.[29]

Establishing a prima facie case is "not an onerous burden," and gives rise to an inference of

discrimination by eliminating the most common nondiscriminatory reasons for plaintiff's treatment.[30]

Plaintiff, a male employee, alleges that he was terminated by BCBS because of his sex.   Generally, to

---

[23]   *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 78, 118 S. Ct. 998, 1001, 140 L. Ed. 2d 201 (1998) (citing *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682, 103 S. Ct. 2622, 2630, 77 L. Ed. 2d 89 (1983)).

[24]   411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

[25]   450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

[26]   *Id.* at 252-53, 101 S. Ct. at 1093; *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824.

[27]   *Id.*

[28]   *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143,120 S. Ct. 2097, 2106,147 L. Ed. 2d 105 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 50, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).

[29]   *Burdine*, at 253, 101 S. Ct. at 1093.

[30]   *Id.* at 254, 101 S. Ct. at 1094.

establish a prima facie case of wrongful termination under Title VII, a plaintiff must show that: (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for the job; (3) despite these qualifications, plaintiff was discharged; and (4) the job was not eliminated after plaintiff was discharged.[31]

Because plaintiff is a male, thus belonging to an historically favored group, the Court must analyze his claim under the framework for reverse discrimination set forth in *Notari v. Denver Water Department*.[32]  The Tenth Circuit explained in that case that the elements of a prima facie case must be adjusted in the context of reverse discrimination because "the presumptions in Title VII analysis that are valid when a plaintiff belongs to a disfavored group are not necessarily justified when the plaintiff is a member of an historically favored group."[33]  The court held that instead of showing that the plaintiff is a member of a protected class, he must establish "background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority."[34]  Alternatively, plaintiff may prove his prima facie case by presenting direct evidence of discrimination or indirect evidence "sufficient to support a reasonable probability, that but for the plaintiff's status the challenged employment decision would have favored the plaintiff."[35]  Plaintiff is simply incorrect in his assertion that this framework only applies to charges of reverse *racial* discrimination.  The Tenth

---

[31]  *See Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999)

[32]  971 F.2d 585 (10th Cir. 1992).

[33]  *Id.* at 589.

[34]  *Id.*; *see Mattioda v. White*, 323 F.3d 1288, 1293 (10th Cir. 2003) ("*Notari* continues to operate as Tenth Circuit precedent and, under *Notari*, Mattioda must demonstrate background circumstances").

[35]  *Notari*, 971 F.2d at 590.

Circuit and this district have repeatedly applied the framework to sex discrimination cases.[36]  The

framework is merely an adjustment to the typical element of a prima facie case that would require the

plaintiff to belong to a protected class.

BCBS argues that plaintiff is unable to sustain his burden of proving a prima facie case of

disparate treatment under Title VII because he has neither shown the requisite background

circumstances discussed above, nor has he provided direct evidence of discrimination or indirect

evidence that but for his sex, BCBS would not have terminated plaintiff's employment.  Plaintiff  argues

that the circumstances of his termination were "fishy," that according to his warning, he should have

been given until March 7, 2003 to meet his sales goals, and that no females were terminated for failing

to meet their sales goals.

The only evidence in the record that could tend to show the requisite background

circumstances is plaintiff's self-serving affidavit, which claims that during his tenure at BCBS, no female

Individual Enrollment Specialists were terminated for failing to meet monthly or annual sales goals.  But

the Court necessarily disregards this evidence as a self-serving, sham affidavit, for the reasons

previously discussed.  Plaintiff's conclusory statement could not be based on personal knowledge and

contradicts his deposition testimony that he did not know why three female Individual Enrollment

Specialists no longer worked for BCBS.  Additionally, the record shows, and plaintiff concedes, that

Oliva gave him extremely positive performance evaluations prior to 2002.  This evidence tends to show

---

[36] *See, e.g., Angove v. Williams-Sonoma*, 70 Fed. Appx. 500, 505, No. 02-5079, 2003 WL 21529409, at *3
(10th Cir. July 8, 2003); *Romero v. City & County of Denver Dept. of Soc. Servs.*, 57 Fed. Appx. 835, 840-41, No. 01-
1488, 2003 WL 220494, at*4 (10th Cir. Jan. 31, 2003); *Beams v. Norton*, 335 F. Supp. 2d 1135, 1150-51 (D. Kan. 2004);
*Wirtz v. Kan. Farm Bureau Servs.*, 274 F. Supp. 2d 1198, 1206-07 (D. Kan. 2003); *Sloan v. Boeing Co.*, No. 92-1014-
MLB, 1994 WL 149197, at *6-8 (D. Kan. Apr. 1, 1994).

that plaintiff's status as a male did not cause or affect the poor performance evaluations that led to his termination.  In short, there is no evidence supporting a prima facie case of reverse discrimination because of sex.

Even if a prima facie case of discrimination could be established, BCBS easily sustains its burden of production in showing that it had a legitimate, non-discriminatory reason for terminating plaintiff.  The record includes documentation evidencing a pattern of conduct by plaintiff during the last year of his employment that included problems with attitude, attendance, and performance, and for which plaintiff was given multiple warnings prior to January 2003.  Problems with plaintiff's performance, attitude and attendance are legitimate, non-discriminatory reasons for his termination.

Plaintiff's remaining arguments pertain to the third prong of the *McDonnell Douglas* burden-shifting framework; that is, that BCBS's stated reasons for terminating him are pretextual.  Plaintiff does not dispute that the record of his performance evaluations is correct.  He essentially argues that he fell short of his goals by such a minimal amount that termination was not warranted or justified.  Plaintiff suggests that only after he was terminated, was there a policy that made monthly performance goals tools by which BCBS would determine continued employment.  The only evidence in the record that plaintiff is able to point to for this proposition is Oliva's January 2003 email to another supervisor about progressive discipline for repeated failures to achieve monthly sales goals.  But this email does not prove that before January 2003  this policy was or was not in place, nor does is prove that BCBS had no policy tying sales goals and performance to discipline, including termination.  Nor does this email prove that the policy was retroactively applied to him because of his sex.

Moreover, plaintiff's performance was not the only reason for his termination.  BCBS was not

16

only concerned with plaintiff's performance slipping, it was concerned about plaintiff's pattern of attendance and attitude problems, which BCBS had documented during 2001, 2002 and January 2003.  In June 2001, plaintiff was warned about tardiness and for a period of time had to email his supervisor every morning when he reported for work.  The supervisor later monitored his arrival through his phone logs.  These same phone logs evidenced that plaintiff failed to make any phone calls during substantial blocks of time.  In November 2002, plaintiff's supervisor documented concerns about plaintiff's attitude when she discussed issues of tardiness and productivity and in November 2002, the supervisor issued a warning letter that if plaintiff's attitude did not improve within 30 days, he would be terminated.  On January 3, 2003, the supervisor issued another written warning about plaintiff's performance, attendance and attitude.        Plaintiff simply fails to carry his burden of proving that BCBS's stated reason for his termination was a pretext for sex discrimination.  Plaintiff counters objective evidence offered by BCBS with plaintiff's own subjective belief that his superiors terminated him because of his status as a male.  But "[m]ere conjecture that [his] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."[37]  Plaintiff's mere assertions are insufficient to show that there is a genuine issue of material fact that BCBS manufactured its reasons for his termination.  For these reasons, the Court GRANTS BCBS's Motion for Summary Judgment on the gender discrimination claim.

---

[37] *Jones v. Denver Post Corp.*, 203 F.3d 748, 754 (10th Cir. 2000) (internal quotation omitted).

### B.  Retaliation

Title VII also prohibits employers from retaliating against employees for complaining about or opposing discrimination.[38]  Retaliation claims are subject to the burden-shifting analysis of *McDonnell Douglas* and *Burdine*.[39]  To establish a prima facie case of retaliation under the statute, plaintiff must prove that: (1) that he engaged in protected opposition to discrimination; (2) that he was subjected to adverse employment action after the protected activity; and (3) there is a causal connection between the protected activity and the adverse employment action.[40]

BCBS does not contest that plaintiff engaged in protected opposition to discrimination when he internally filed the sexual harassment complaint with BCBS.[41]  Nor does it contest that plaintiff suffered adverse employment action, termination, after filing the complaint.  Plaintiff has also established the third element of a prima facie case, causal connection, by showing close temporal proximity between the complaint and the termination.  It is uncontroverted that less than one month passed between plaintiff filing his internal sexual harassment complaint and his termination on January 30, 2003.  This close temporal proximity is sufficient to support an inference of causation.[42]

---

[38]   42 U.S.C. § 2000e-3(a).

[39]   *McGarry v. Bd. of County Comm'rs*, 175 F.3d 1193, 1201 (10th Cir. 1999).

[40]   *Mattioda*, 323 F.3d at 1293; *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1205 (10th Cir. 2000).

[41]    The Court recognizes that plaintiff has withdrawn his sexual harassment claim; however, it is not necessary for plaintiff to succeed on that underlying claim in order to prove a case of retaliation if he had "a mistaken good faith belief that Title VII ha[d] been violated."  *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 385 (10th Cir. 1984) (collecting cases); *see also Crumpacker v. Kan. Dep't of Human Res.*, 338 F.3d 1163, 1171 (10th Cir. 2003) (explaining that an actual violation of Title VII is not required to maintain a retaliation actions under the statute but clarifying that the plaintiff must have had a reasonable good faith belief that the underlying conduct was a violation of the statute).

[42]   *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1217 (10th Cir. 2003) (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)); *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994),

BCBS easily sustains its burden of production that it had legitimate, nondiscriminatory reasons for terminating plaintiff; namely, his problems with attendance, attitude, and performance.  Thus, the burden shifts to plaintiff to show that BCBS's explanation is merely a pretext for retaliation against him for filing a complaint.  But plaintiff fails to produce evidence of pretext other than the close temporal proximity of his complaint and the termination.  While close temporal proximity is alone sufficient to establish a causal connection, it is not alone sufficient to show pretext.[43]

Plaintiff argues, without support from the record, had Oliva not delayed his 2002 evaluation, he would have qualified for a "commendable" or "distinguished" rating before he filed his complaint.  But there is no evidence in the record concerning the weight or points plaintiff would have been given on his 2002 evaluation.  Nor can this be extrapolated from his prior annual reviews, for the record shows that weights assigned to each category varied over the years.  During plaintiff's tenure at BCBS, meeting sales goals accounted for anywhere between 40% and 60% of his overall performance.  The remaining factors, including personal growth and administration would undoubtedly encompass any issues that dealt with attitude and attendance.  Plaintiff simply has no personal knowledge that would allow him to predict how he would have been evaluated based on these unknown factors and there is no independent evidence that would support his conclusory assertions on the matter.

Plaintiff also contends that Oliva's decision to delay the 2002 performance evaluation was not legitimate, considering he would have been "deserving of a fair or marginal rating."  But this does not

---

*overruled on other grounds*, *Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1194-95 (10th Cir. 1998); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (D. Kan. 2004).

[43] *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000); *Banks v. Armed Forces Bank*, 313 F. Supp. 2d 1095, 1104-05 (D. Kan. 2004).

provide evidence of pretext, because Oliva gave plaintiff notice in November and December that she was delaying his evaluation.  This was before he filed his complaint in January.

Other uncontroverted facts refute, rather than support pretext.  Plaintiff filed his complaint on January 6; and Oliva was aware of the complaint, because the EEO investigator interviewed Oliva sometime before the investigator relayed her findings to plaintiff on January 23.  Yet on January 24, the day after the EEO investigator's report, Oliva issued her monthly status report, which, consistent with her January 3 warning letter, reminded plaintiff that he faced termination in March if he failed to meet his sales goals in February and March.  This conduct is not consistent with retaliation.  In fact, this was consistent with Oliva's December status report, which urged plaintiff to come up with a plan for improvement in 2003.  Plaintiff offers no reason why in January, BCBS would allow him two months to improve his sales numbers if it intended all along to terminate him in retaliation for filing a complaint it was already aware of.  And, even if Oliva's comments on the December status report did not mention the prospect of termination on the basis of sales, BCBS did not terminate plaintiff solely because of sales.

Rather, BCBS terminated plaintiff because of continued problems with attitude and attendance, as well as his failure to meet the January 2003 sales goals.  After indicating on January 24, that she was continuing to follow the course of discipline already established, on January 29, Oliva discovered that plaintiff signed into his phone thirteen minutes late and failed to complete certain assignments that date.  This additional incident concerning plaintiff's  attendance and attitude the previous day, occurred after the monthly goal attainment form was completed and after multiple warnings.  Thus, he was terminated on January 30, and his sales performance in February and March became a moot point.

20

Despite construing the evidence in the light most favorable to plaintiff, the Court is unable to conclude that a genuine issue of material fact exists with regard to his retaliation claim.  This is a case where summary judgment is appropriate because, "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or . . . the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred."[44]  Therefore, the Court GRANTS defendant's motion for summary judgment on the retaliation claim.

Because the Court has granted summary judgment on all plaintiff's remaining claims, the after-acquired evidence defense is moot.[45]

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 34) is GRANTED.

IT IS SO ORDERED.

Dated this  _4th_  day of February, 2005.


    **S/ Julie A. Robinson**

-------------------------

[44]  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000).

[45]  If applicable, the doctrine, as defendant acknowledges in its brief, may only operate to exclude front pay and/or reinstatement from an employment discrimination plaintiff's damage award.  *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 362, 115 S. Ct. 879, 886, 130 L. Ed. 2d 852 (1995).  However, the Court notes that even if the defense was relevant in light of the summary judgment holding, it is inapplicable as a matter of law to the facts of this case.  Regardless of whether plaintiff's act of taking paperwork from the BCBS building when he was terminated violated defendant's confidentiality policy, the conduct at issue occurred *after* plaintiff was terminated.  The Court declines to extend the after-acquired evidence doctrine to post-termination conduct.  *Accord Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1281 (10th Cir. 1999) (citations omitted).

**Julie A. Robinson**
**United States District Judge**